**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| _____ | : | |
| JUDITH MORAN, | : | Civil Action No. 06-5620 (JAP) |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | **OPINION** |
| DAVITA, INC., et al., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

APPEARANCES:

Timothy P. Beck, Esq.
DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, P.C.
15 Mountain Boulevard
Warren, New Jersey 07059
　　　　*Attorney for Plaintiff*

Matthew H. Adler, Esq.
Pepper Hamilton LLP
Suite 400
301 Carnegie Center
Princeton, New Jersey 08543

Amy G. McAndrew, Esq.
Pepper Hamilton LLP
400 Berwyn Park
899 Cassatt Road
Berwyn, Pennsylvania 19312
　　　　*Attorneys for Defendants DaVita, Inc. and Javier Rodriguez*

Pisano, District Judge:

Plaintiff Judith Moran brings this suit against her former employer, Defendant DaVita, Inc., and her former DaVita supervisor, Javier Rodriguez, for gender discrimination and breach of contract, together with related statutory and common law claims. This Court has jurisdiction over the instant dispute pursuant to 28 U.S.C. § 1332(a).

## I.      Background

### A.      The Employment Relationship Between Moran and DaVita

Plaintiff Judith Moran, a forty-two year old New Jersey resident and registered nurse, began to work for a dialysis company called Ren Corporation in 1993. The following year, in 1994, Moran continued her employment as Ren Corporation became Gambro Healthcare USA ("Gambro"). She executed an employment contract with Gambro on or about August 26, 2000 (the "Employment Agreement"), which defined the terms, benefits, and conditions of her continued employment. During her time at Gambro, Moran was repeatedly given positive performance reviews for her work as a Regional Vice President, which involved overseeing the operations of the forty-two dialysis clinics in New Jersey, Connecticut, Massachusetts, and New Hampshire. Moran was also responsible for developing marketing strategies for her region, achieving certain company fiscal goals, and ensuring compliance with pertinent safety regulations.

Defendant DaVita, Inc. ("DaVita"), a Delaware corporation headquartered in California, provides dialysis services for patients diagnosed with chronic kidney disease. DaVita received approval from the Federal Trade Commission to acquire Gambro on October 4, 2005, and the acquisition was completed that same month. Following the acquisition, Moran continued in her

same position as Regional Vice President through the summer of 2006, but rather than

overseeing forty-two clinics in New Jersey, Connecticut, Massachusetts, and New Hampshire,

instead she was responsible for sixty clinics across New Jersey and Eastern Pennsylvania.

(Marissa L. Quigley Certification ("Quigley Certif."), Ex. 1.)[1]   DaVita appointed Defendant

Javier Rodriguez as Senior Vice President and placed Moran's region within the ambit of

Rodriguez's oversight responsibilities.  Rodriguez has held this position since 2006.

###    B.    Terms of the Employment Agreement

Around the time of the merger with Gambro, DaVita announced to Gambro employees

DaVita's intention to assume all existing employment contracts and further represented that "all

terms and conditions of any such contract [would] remain in effect and binding on *both* parties to

the contract." (Pl.'s Br., Ex. B (emphasis in original).)  In the event of a termination without

cause by either the employer or employee, Moran's Employment Agreement required six months

written notice to the other party but afforded the employer the right to "immediately remove ...

Moran from his [*sic*] employment duties, but with unaltered benefits for Moran during the period

---

[1]       In connection with the two summary judgment motions, and cross-motion to amend a Complaint, the Court has considered the following documents in writing this Opinion: (1) *Docket Entry No. 21* – Defendants' Brief in Support of Motion for Summary Judgment on All Counts ("Defs.' Br."), Marissa L. Quigley Certification ("Quigley Certif.") and attached exhibits; (2) *Docket Entry No. 27* – Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment on All Counts and in Support of Plaintiff's Cross-Motion to Amend Complaint ("Pl.'s Opp'n") and attached exhibits; (3) *Docket Entry No. 34* – Defendants' Reply Brief ("Defs.' Reply"), Marissa L. Quigley Supplemental Certification ("Quigley Supp. Certif.") and attached exhibits; (4) *Docket Entry No. 35* – Defendants' Brief in Opposition to Plaintiff's Motion to Amend Complaint ("Defs.' Br. Opp'n to Amend"); (5) *Docket Entry No. 22* – Plaintiff's Brief in Support of Motion for Summary Judgment on Counts 1, 2, and 5 of the Complaint ("Pl.'s Br.") and attached exhibits; (6) *Docket Entry No. 29* – Defendants' Brief in Opposition to Plaintiff's Motion for Summary Judgment on Counts 1, 2, and 5 of the Complaint ("Defs.' Opp'n"), Marissa L. Quigley Certification ("Quigley Opp'n Certif.") and attached exhibits; and (7) *Docket Entry No. 33* – Plaintiff's Reply Brief ("Pl.'s Reply") and attached exhibits.

of notice." (Quigley Certif., Ex. 2.) Moran's Employment Agreement also provided for twelve months severance pay following the termination, "based on the base annual salary and the average of bonus payments during the past three complete fiscal years." (*Id.*) Moran was therefore entitled to six months of "notice" pay, as well as twelve months of "severance" pay, in the event either Moran or DaVita terminated her employment without cause.

### C.    Termination of Moran's Employment with DaVita

#### 1.    Pre-termination Communications Between Moran and Rodriguez

The relationship between Moran and DaVita grew strained during the early part of 2006 and in early March, Moran requested a meeting with Rodriguez to discuss her 2006 bonus. Moran was dissatisfied because she had been advised that no bonus was forthcoming notwithstanding her group's satisfaction of certain performance benchmarks. (Quigley Certif., Ex. 1.) At the March 22, 2006 meeting, held in Rodriguez's office in Berwyn, Pennsylvania (the "March meeting"), Rodriguez informed Moran that he did not foresee her remaining in the Regional Vice President position. (Quigley Certif., Ex. 1 at 108.) Rodriguez advised Moran that he had been approached by several other DaVita employees, including Joseph Mello, DaVita's Chief Operating Officer, complaining of various issues related to Moran and her department. (*Id.*; Quigley Certif., Ex. 6 at 28-29, 48-49.) Complaints ranged from displeasure and frustration at Moran's handling of her department's budget negotiations to dissatisfaction with Moran's hiring of ineffective managers and directors and her failure to meet certain financial and strategic goals for her region. (Quigley Certif., Ex. 6 at 28-29, 48-49.) Overall, Rodriguez had received information that both Moran and her region were "weak." (*Id.* at 25-26.)

At the meeting, Rodriguez relayed to Moran the complaints about her performance and

discussed specific problems with clinics in the region for which Moran had been responsible prior to Gambro's merger with DaVita.  (*Id*. at 70.)  When she pressed Rodriguez for details about these issues with the clinics, he responded vaguely, mentioning that "there were problems." (Quigley Certif., Ex. 1, at 109.)  Rodriguez told Moran that she "was not going to make it in this role [of Vice President]." (*Id*. at 115.)  Rodriguez clarified that Moran was not being terminated at that time and that she needed to perform as a Vice President in April for a national meeting in Texas.  (Pl.'s Br., Ex. R at 111.)  He also informed her that he would need to provide Moran with formal written notice of her effective termination date.  (*Id.* at 112.)

In April, Moran sent a memorandum to Rodriguez complaining of specific incidents with DaVita staff and management.  Moran wrote, "DaVita, Inc. may be exercising the provision to terminate [Moran's] employment without cause pursuant to Section 14 of [her] Employment Agreement."  (Pl.'s Br., Ex. C.)  Moran explained that though she did not agree with the termination decision, the notice provisions in the Employment Contract required six months written notice before her employment "expire[d]."  (*Id.*)  Therefore, Moran wanted to "reiterate the concerns" Moran had expressed to Rodriguez during prior meetings. (*Id.*)

Moran first disclosed the specifics of an encounter with a male, DaVita employee that she had alluded to in the March meeting.  (*Id.*)  When Moran and Rodriguez discussed the budget process for her region, Moran had expressed discomfort with certain communications made by David Smith, a DaVita Divisional Financial Analyst assigned to work with Moran's department for the budget process.  In October 2005, Smith allegedly told Moran that she was both evil and difficult to work with, and that Smith went to church in order to pray for Moran.  (*Id.*)  Moran averred that Smith relayed these comments to Donald Beuerle, the Financial Director of Moran's

group, but that Smith was never confronted or reprimanded about these comments by DaVita management.  (*Id.*)  Moran next informed Rodriguez that she considered the work environment at DaVita to be hostile, and that she "d[id] not believe that upper management's response to the [Smith] situation assisted in the resolution of the problem and simply invited Mr. Smith to continue feeling free to make such comments which can obviously make team leadership much more difficult. it [*sic*] also left [Moran] open to future insults and inappropriate remarks."  (*Id.*)

Finally, Moran raised concerns about her compensation.  At the time of the merger with Gambro, DaVita had offered to some employees two compensation packages: the status quo (compensation remained the same) and the "DaVita Approach" (annual salary reduced by $30,000 but with corresponding increase in equity sharing).  Moran claimed that the "DaVita Approach was "appropriate for employees who had long-term expectations with the company" and that Moran believed, based on her conversations with Rodriguez, that DaVita had contemplated Moran's termination prior to her election of the DaVita Approach compensation package.  (*Id.*)  Therefore, Moran argued, DaVita's having offered her the DaVita Approach option was "tantamount to misrepresentation of material circumstances which should have been disclosed to [Moran] before [she] made an election with specific financial consequences."  (*Id.*)

### 2.    The Termination Memo

The next communication between the parties came in May, when Rodriguez sent a memorandum (the "Termination Memo"), prepared with the assistance of Steven Cooper, DaVita's labor counsel, to Moran on May 2, 2006,[2] informing her that DaVita was terminating

---

[2]     DaVita originally intended to give Moran the Termination Memo on April 25, 2006, but concedes that Moran did not receive it until May 2, 2006.  (Quigley Certif., Ex. 9 at 40-41.)  Therefore, the "effective date of termination" designated by the Termination Memo is

her employment pursuant to the terms of the Employment Agreement.  (Pl.'s Br., Ex. D.)  The Termination Memo described certain deficiencies with Moran's performance, including her difficulty with the budget process, the inadequacy of her region's managers and directors, and other issues related to clinics in her region.  (*Id.*)  Rodriguez wrote that Moran would receive a severance agreement from DaVita in the upcoming months that Moran would be required to execute in order to receive the severance package detailed in the Employment Agreement.  (*Id.*)

The Termination Memo further instructed Moran that DaVita could not "begin paying [Moran's] severance until 6 months after the end of [her] employment – if [DaVita] did, [Moran's] severance would be subject to a 20%, non-deductible, excise tax. [DaVita is] advising [Moran] of this now so [she] can make the necessary preparations."  (Pl.'s Br., Ex. D; Quigley Certif., Ex. 10.)

Moran continued to render services to DaVita after receipt of the May 2 Termination Memo, hosting a late-May team meeting at the Borgata Hotel and Casino in Atlantic City, New Jersey, for which she charged $9,632.13 of meal and lodging expenses to DaVita.  (Quigley Certif., Ex. 15.)  It was at this meeting that Moran informed her staff that she would no longer be continuing her employment with DaVita.  (Pl.'s Opp'n, Ex. 4 at 186.)  DaVita did not reimburse Moran for these expenses until December 2006, apparently because DaVita was "looking into" the request "to determine if [Moran] intentionally misused company resources.  If that is [were] the case, she would not be entitled to her severance payment because [DaVita] would have

_____

October 25, 2006 – "six months from the date of th[e Termination M]emorandum" – and not November 2, 2006.  (Pl.'s Br., Ex. D.) Rodriguez testified that he understood the Termination Memo to mean that Moran's employment would conclude six months from the date of the Termination Memo.  (Pl.'s Br., Ex. U at 133.)  In its Responses to Request for Admissions, DaVita conceded that the notice period concluded November 2, 2006.

grounds to terminate her employment for cause." (Pl.'s Br., Ex. N.)

### 3.    Moran's Termination and Communications Between Counsel

DaVita sent Moran a "Severance and General Release Agreement" on June 16, 2006 (the "Severance Agreement"), which Moran was required to execute in order to receive the severance benefits provided under the Employment Agreement.  Prior to receiving this agreement, Moran had been in touch with DaVita's Human Resources personnel to obtain more details regarding her separation from the company.  (Pl.'s Br., Exs. F, G.)  These communications made clear Moran's expectation that she would remain in DaVita's employ through the November 2, 2006 expiration of the notice period.  (*Id.*)  Under the terms of the Severance Agreement, which contained general and specific releases of any legal claims against DaVita, Moran's effective date of termination was June 16, 2006.  (Quigley Certif., Ex. 22.)  June 16, 2006 was Moran's last day providing services to DaVita and DaVita ceased payments to Moran on that date.[3]

On June 30, Moran's attorney, Timothy Beck, sent a letter to Mr. Cooper to question the necessity of Moran executing the Severance Agreement, because "Moran's Employment Agreement contain[ed] specific articles governing the termination of her employment, her severance remuneration, and provisions that define and establish [her] rights and DaVita's obligations."  (Quigley Certif., Ex. 25.)  Beck also inquired about certain provisions within the agreement, including whether § 409A of the United States Tax Code was applicable to Moran.  (*Id.*)  Cooper responded to Beck by letter on July 17, 2006 and informed Beck that it was DaVita's position that: (1) Moran's Employment Agreement permitted DaVita to immediately

---

[3]    Though Moran claims she continued to render services to DaVita past June 16 (Pl.'s Br. at 8), she has failed to provide any evidence supporting these claims.  Accordingly, the factual contentions are stricken for failure to comply with Local Rule 56.1.

remove Moran from her duties, prior to the expiration of the notice period, and that because

Moran was no longer performing any services for DaVita, she was no longer an "employee"

entitled to benefits under the terms of the employee benefit plans (Quigley Certif., Ex. 24); (2) §

409A did apply to Moran, one of the 50 highest-paid DaVita employees as of December 31,

2005, and that § 409A's six month waiting period "is required by federal law" (*id.*); and (3) the

Severance Agreement provided greater, additional benefits to Moran than those bestowed under

the Employment Agreement, specifically that DaVita was calculating her severance payments

using the higher salary amount Moran had received prior to executing the DaVita Approach stock

plan, was providing her with COBRA cost-sharing, and prematurely vesting her account in the

company's retirement plan.  (*Id.*)

### D.      DaVita Payments Made to Moran

Between May 2 and June 16, 2006, DaVita paid to Moran $26,578.92, less standard

withholdings, representing her salary for that time period.  (Quigley Certif., Ex. 1 at 208.)  This

also represented the amount of notice pay due to Moran for this time period under the

Employment Agreement.  (Quigley Certif., Ex. 14.)  However, ostensibly due to the uncertainty

regarding § 409A and Moran's refusal to execute the Severance Agreement, DaVita did not

commence payment of Moran's severance and the remainder of her notice pay (the amounts

accrued from June 17 through October 30, 2006) until December 30, 2006, six months after

Moran's last day at DaVita on June 16, 2006.  On December 30, 2006, DaVita deposited

$92,218.47 into Moran's Bank of America checking account, representing the remaining notice

pay owed to Moran and "the start of the severance obligation."[4]  (Defs.' Br. 12.)  Thereafter, DaVita paid Moran in biweekly installments, ultimately depositing a total of $276,397.99 by November 3, 2007.  The parties agree that this amount is consistent with the total amount of notice and severance pay due to Moran under the Employment Agreement.

On January 5, 2007, DaVita made two deposits to Moran's checking account, totaling $49,799.76.  (Pl.'s Br., Ex. Q.)  On January 10, 2007, Moran transferred $45,000 from her checking account into her savings account.  The following day, on January 11, 2007, DaVita reversed the two payments to Moran's account, totaling $49,799.76, (*id.*) apparently at the direction of DaVita's labor counsel, Mr. Cooper.  (Pl.'s Br., Ex. T at 30.)  These withdrawals resulted in Moran's checking account carrying a substantial negative balance, and subjected her to a $19 fee. (Ex. Q to Pl.'s Br.) Moran transferred funds from her savings account back into her checking account the following day, January 12, 2007.  (*Id.*)  The next week, on January 19, 2007, DaVita deposited $5,131.73 into Moran's account.  (*Id.*)

**E.    Other Terminated Employees and 26 U.S.C. § 409A**

Section 409A of the Internal Revenue Code ("§ 409A") was added through the enactment of the American Jobs Creation Act of 2004, 118 Stat. 1418.  The IRS subsequently issued application guidance regarding § 409A and published a notice of proposed rule making in the Federal Register on October 4, 2005.  Application of Section 409A to Nonqualified Deferred Compensation Plans, 70 Fed. Reg. 57,930 (Oct. 4, 2005).  However, the proposed regulations were not finalized until April 17, 2007, after an extensive comment period.  Application of

---

[4]      DaVita subsequently attempted to reverse this payment, but Moran had already moved some of the funds into her savings account.  (Quigley Certif., Ex. 30 at 34.)

Section 409A to Nonqualified Deferred Compensation Plans, 72 Fed. Reg. 19234 (Apr. 17, 2007). Given the one and a half year gap between the date of the proposed regulations and the date of their finalization, DaVita was concerned about § 409A's effect on DaVita's severance obligations. (Quigley Certif., Ex. 9 at 119-121.) Mr. Cooper testified that after reviewing the proposed changes and the IRS's interim guidelines, he concluded that these changes arguably imposed a non-deductible twenty (20) percent excise tax on severance benefits if disbursed to DaVita's fifty highest paid employees within the first six months following the employee's termination. (*Id.*) As early as April 2006, DaVita became concerned that in the event the tax was imposed, the affected employee would later seek additional compensation from DaVita to compensate for the loss, and accordingly began to ask terminated employees to either execute a release or consent to a six month delay in payment of severance benefits. (*Id.*; Quigley Certif., Ex. 18.)

Moran has alleged that she received disparate treatment from DaVita, regarding the termination of her employment and the delay in payment pursuant to § 409A, when compared with two male, former Gambro employees who DaVita terminated in 2006: Robert Oldfield, a Senior Vice President, and Donald Beuerle, a management-level director. DaVita advised all three employees that in order to receive severance payments in advance of § 409A's six month waiting period, they must execute their respective severance and release agreements. (Quigley Certif., Ex. 9 at 120-121; Pl.'s Br., Ex. J.) Just as he had with Moran's attorney, Cooper communicated with Beuerle and Oldfield regarding whether § 409A applied to their severance packages. (Pl.'s Br., Ex. L.) However, unlike Moran's situation, Cooper advised Oldfield in his August 21, 2006 e-mail that: "At your request, we have followed up with outside counsel to

determine if you fall within any exception to Section 409A. We believe that you may fall within one of the exceptions and, therefore, have removed that provision from the [severance] agreement." (Pl.'s Br., Ex. L.)  Oldfield executed a severance and release agreement on September 18, 2006, and received severance payment after executing the agreement.  (Quigley Certif., Exs. 20, 9 at 104.)  The record is silent as to whether DaVita similarly concluded that Beuerle fell within an exception to § 409A, but he executed a severance and release agreement, releasing all claims against DaVita, on September 20, 2006 and he received severance payments shortly thereafter.  (Quigley Certif., Exs. 21, 9 at 170.)

Moran's former position was subsequently filled by fifty-five year old Dennis Skrajewski. (Quigley Certif., Ex. 13, ¶¶ 2, 3.)

## II.     Procedural History

Moran filed an eleven-count Complaint against DaVita and Rodriguez in New Jersey Superior Court, Somerset County, on October 11, 2006.  The Complaint, which seeks compensatory damages and declaratory and injunctive relief, alleges age and gender discrimination, breach of contract, violation of New Jersey wage laws, and various tort causes of action.  Defendants removed the action to this Court, and filed an Answer on December 1, 2006.

Moran filed a motion for summary judgment on her breach of contract claim and sought a declaration voiding the non-compete provision in the Employment Agreement.  The Court denied this motion without opinion by way of an order dated July 3, 2007.

## III.    Motion to Amend/Correct Notice of Removal

As part of Plaintiff's opposition to Defendants' present motion for summary judgment, Moran seeks this Court's leave to amend Count Two of her Complaint, pursuant to Federal Rule

of Civil Procedure 15,[5] to include an unjust enrichment or other equitable claim for an additional

$14,198.13, allegedly representing the difference between nine pay periods at the notice pay rate

($6,644.73) which Moran received, and nine pay periods at the severance pay rate ($8,222.30) to

which Moran believes she is entitled.  Moran argues that because DaVita terminated her

employment as of June 16, 2006, and not November 2, 2006 (the end of the notice period),

Moran is entitled to receive the severance pay rate for the time period between June 16, 2006 and

October 25, 2006.  Defendants oppose the motion.

　　　　Under the Federal Rules of Civil Procedure, a plaintiff may amend her complaint once as

a matter of right, "(A) before being served with a responsive pleading; or (B) within 20 days after

serving the pleading if a responsive pleading is not allowed and the action is not yet on the trial

calendar."  Fed. R. Civ. P. 15(a)(1).  Other amendments are permitted only if the movant's

adversary consents or the Court grants leave to amend.  Fed. R. Civ. P. 15(a)(2).  A court should

freely grant leave to amend "when justice so requires," and where there is no indicia of undue

delay, bad faith, or undue prejudice to the movant's adversary.  Fed. R. Civ. P. 15(a)(2); *see*

*Foman v. Davis*, 371 U.S. 178, 182 (1962).  Though "the grant or denial of an opportunity to

amend is within the discretion of the District Court," if a District Court denies the amendment, it

must provide a justifying reason for the denial so as not to constitute an abuse of the court's

discretion.  *Foman*, 371 U.S. at 182.

　　　　Moran has failed to provide the Court with a proposed amended Complaint as required by

New Jersey Local Rule 7.1(f) ("[u]pon filing of a motion for leave to file an amended complaint

---

[5]　　　　Though Plaintiff cites Federal Rule of Civil Procedure 12(d) as governing her
request to amend her Complaint, the Court considers this mis-citation to be merely a
typographical error.

... the moving party shall attach to the motion a copy of the proposed pleading or amendments"). Instead, Moran apparently relies on her briefing papers to provide the basis for this Court to reform Moran's original Complaint, which has been the operative Complaint since October 2006. This failure alone is sufficient to deny leave to amend.  *See Lake v. Arnold*, 232 F.3d 360, 374 (3d Cir. 2000) (holding that even where district court had failed to provide a justification for its denial of plaintiffs' motion to amend their complaint, the court had not abused its discretion in so denying because "[plaintiffs'] failure to provide a draft amended complaint would be an adequate basis on which the court could deny the plaintiff's [*sic*] request").  Moreover, the Defendants would be prejudiced by the Court granting leave to amend Moran's Complaint at this late date. Moran has had ample time since submitting her motion to amend on September 22, 2008 to supplement the filing with a proposed amended Complaint.  Defendants' reply papers, filed September 29, 2008, alerted Moran to this deficiency in her filing and yet Moran has still failed to correct the error.  Accordingly, Moran's motion to amend her Complaint is denied.  The Court will consider the originally filed Complaint (Docket Entry No. 1) as the operative document for the instant motions for summary judgment.

## IV.    Summary Judgment Motions

### A.    Standard of Review

A court shall grant summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material

fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must first show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party may not simply rest on its pleadings, but must offer admissible evidence that establishes a genuine issue of material fact, *id.*, and not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but rather determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**B.    Analysis**

Moran has asserted eleven claims against DaVita and Rodriguez, which the Court will consider in turn.

**1.    Contract Claims (Counts Two and Six)**

Moran alleges that DaVita and Rodriguez breached the Employment Agreement by: (1) requiring Moran to execute the Severance Agreement in order to receive benefits afforded to her

under the Employment Agreement; (2) terminating Moran's employment in advance of the

expiration of the six month notice period set forth in the Employment Agreement; and (3) failing

to provide Moran with benefits and severance pay in accordance with the Employment

Agreement.  (Compl., Count Two, ¶¶ 7-11.)  Moran asserts a second contract claim against

DaVita for reimbursement of certain business expenses incurred during the May 2006 meeting in

Atlantic City.  (Compl., Count Six, ¶¶ 2-14.)  Moran seeks payment for all notice pay, severance

pay, "reimbursement for all benefits, compensation damages, plus attorneys fee, interest and

costs of suit."  (Compl,. Count Two, Prayer for Relief.)

DaVita argues that it has paid all of the notice and severance monies owed to Moran, as

well as reimbursed her for the expenses forming the basis for her Sixth Count, and that the

undisputed fact of payment conclusively demonstrates DaVita's performance on the Employment

Agreement and vitiates any finding of damages with regard to these claims.  DaVita further

argues that: (1) Moran is not entitled to attorneys' fees as a matter of New Jersey law; (2)

Moran's claim for interest on the notice pay (representing the period of June 16, 2006 through

November 2, 2006) is belatedly pursued and fails because Moran refused to execute a release

which would have resulted in DaVita's having paid Moran her notice pay earlier; and (3) Moran

has articulated no basis for an unpaid benefits or loss of benefits claim because Moran could not

legally remain a participant in DaVita's employee plans after cessation of her services as a

DaVita employee on June 16, 2006, and further, that DaVita shared the cost of Moran's COBRA

payments after that date.

The Court agrees that the undisputed fact of DaVita's payment to Moran of $276,397.99

moots Moran's claim for contract damages, based on the notice and severance pay that remained

outstanding at the time of Moran's filing of this suit, even if DaVita breached the Employment

Agreement in the timing of its payments.  (*See* Pl.'s Br. at 23.)  Further, DaVita's payment of

$9,632.13 to Moran to reimburse her for the Atlantic City conference moots Moran's claim for

reimbursement of her expenses in Count Six.[6]  Therefore, the Court need only consider Moran's

entitlement to the other monetary relief sought: attorneys' fees and costs of suit, a civil penalty,

stock options, and reimbursement for all benefits.  (Compl., Counts Two and Six, Prayers for

Relief.)  The parties have raised a choice of law issue, and each category of damages is addressed

in turn.

### a.  Choice of Law

Though a choice of law determination may be unnecessary in matters of general contract

interpretation, the award of attorneys' fees and penalties in the instant case necessitate a choice of

law between New Jersey and Colorado law to govern the Employment Agreement.  Moran

argues that the Employment Contract should be governed by Colorado law, pursuant to the

choice-of-law provision in the Employment Agreement,[7] and that the amounts of civil penalty

and attorneys' fees authorized by Colorado Wage Claim Act should be added as damages for the

contract claim.  Defendants, in contrast, submit that the contract claims advanced pursuant to the

_____

[6]     The Court notes that Count Six of Moran's Complaint seeks recovery of $11,296.15 for expenses incurred during the Atlantic City conference.  Defendants have paid Moran only $9,632.13, the amount charged to Moran's DaVita corporate credit card.  Moran failed to oppose Defendants' motion for summary dismissal, which argued that the claim was mooted by DaVita's payment of $9,632.13.  Accordingly, the claim is dismissed as moot.

[7]     The section provides:  "17.10 Governing Law.  The validity, interpretation, construction and performance of this agreement shall be governed by the laws of the State of Colorado, applicable contracts entered into and performed in such State without regard to the choice-of-law provision thereof."  (Quigley Certif., Ex. 2.)

Employment Agreement should be interpreted according to New Jersey law because the "center of gravity" in this litigation is the State of New Jersey, and not Colorado, and New Jersey law does not authorize disbursement of civil penalties and attorneys fees in these situations.  The Court agrees that New Jersey law governs the Employment Agreement.

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state." *Echols v. Pelullo*, 377 F.2d 272, 275 (3d Cir. 2004) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941)).  This Court must thus apply this State's choice of law rules in deciding which state's law governs Moran's contract claims.  New Jersey employs a governmental-interest test requiring a court to elect "the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." *Gantes v. Kason Corp.*, 145 N.J. 478, 484 (1996) (internal citations omitted).  This requires a two-prong analysis: (1) "an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis[,]" *Gantes*, 145 N.J. at 484; and (2) a "determin[ation regarding] the interest that each state has in resolving the specific issue in dispute" based on the governmental policies underlying each state's law and the effect of each state's litigation-related contacts on those policies. *Id.* at 485.  "If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply." *Veazey v. Doremus*, 103 N.J. 244, 248 (1986).

Therefore, a threshold inquiry in the choice-of-law analysis is whether conflict exists between the laws of New Jersey and Colorado.  *See Gantes*, 145 N.J. at 484.  Defendants urge this Court to find that New Jersey law applies to Moran's claims under the Employment Agreement, notwithstanding "Moran['s] attempt to manufacture a claim under Colorado law for

penalties and attorney's fees." (Defs.' Opp'n at 6.) In contrast, Moran argues that Colorado law governs all aspects of the Employment Agreement pursuant to the choice-of-law provision in the agreement and because "DaVita has offices in Colorado." (Pl.'s Br. at 21.) However, the choice of law concerns not so broad an issue as whether conflicts exist between all of New Jersey and Colorado contract law. Rather, the Court must determine whether issues related to the interpretation of the Employment Agreement, for example, the availability of extra-contractual damages, present an actual conflict between the laws of New Jersey and Colorado. This Court concludes that a conflict exists.

Under the Colorado Wage Claim Act, where an employee-plaintiff "recovers a sum greater than the amount tendered by the employer, the court may award the employee reasonable costs and attorney fees incurred in such action." Colo. Rev. Stat. Ann. § 8-4-110(1) (hereinafter, "CWCA"). Further, under the CWCA, an employer who refuses to pay wages within sixty days after receiving a written demand for payment is liable to the employee for an amount equal to the greater of fifty percent of the amount of compensation due or the employee's average daily earnings for each day payment remains delinquent, though not to exceed ten days. *See* CWCA § 8-4-109(3)(b). In contrast, it is undisputed that the New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 *et seq.*, mandates no such remuneration to a prevailing employee-plaintiff. Though Moran may be correct that, as a general matter, Colorado contract law is not in actual conflict with New Jersey contract law, it is clear that on the issue of attorneys' fees and penalties, Colorado and New Jersey law are in actual conflict.

Having established that the laws of New Jersey and Colorado regarding attorneys fees and penalties are in conflict, the Court must now determine each state's interest in the litigation.

Plaintiff argues that the choice-of-law provision in the Employment Agreement, along with the contention that DaVita "stands in [Gambro's] shoes, the drafter of the [Employment Agreement]" and should thus be bound by Gambro's selection of Colorado as the agreement's governing law, should be sufficient to satisfy the government interest prong.  Under New Jersey law, a contractual choice-of-law provision is given effect unless it violates the public policy of New Jersey.  *Kalman Floor Co., Inc. v. Joseph L. Muscarelle, Inc.*, 196 N.J. Super. 16, 21 (App. Div. 1984).  Courts have held that,

> [A] choice of law provision will not be honored:  (1) if the state chosen has no substantial relationship to the parties or the transaction; or (2) application of the law chosen would conflict with a fundamental public policy of a state having a greater interest in a determination of a particular issue and [the law] of such state would be applicable in the absence of the choice of law provision under the governmental-interest analysis.

*Prudential Ins. Co. of Am. v. Nelson*, 11 F. Supp. 2d 572, 578 (D.N.J. 1998); *see also* Restatement (Second) of Conflict of Laws § 187 (1971).

This Court finds that all substantial contacts between the parties and the transaction are with the State of New Jersey.  New Jersey's factual contacts with this case are many:  The Employment Agreement was negotiated, executed, and performed in New Jersey; Moran's employment at Gambro and DaVita was based in the companies' offices in New Jersey throughout her employment;  Moran is a New Jersey resident; and DaVita's alleged wrongful conduct occurred in New Jersey and in connection with Moran's New Jersey-based employment. Contacts with Colorado, in contrast, are nonexistent:  Moran has never lived in Colorado; Moran has never been licensed as a nurse in Colorado, nor has she ever worked or treated patients there; DaVita is a California company incorporated in Delaware; and discovery has concluded and no

evidence or witnesses were produced from Colorado.  Though DaVita has an office in Colorado, as Moran points out, that individual contact alone is insufficient to constitute a substantial relationship between Colorado and the instant dispute.  Finally, even if the Court were persuaded to apply Colorado law to Moran's contract claims, it is unclear whether Moran, as a New Jersey and not Colorado resident, would be permitted to recover a penalty or attorneys fees under the CWCA, as it appears the act is directed primarily at in-state employees.  *See* CWCA § 8-4-101(5) (in the definitions section of the statute stating, "'Employer' means every person, firm, partnership, association, corporation, migratory field labor contractor or crew leader, receiver, or other officer of court in Colorado, and any agent or officer thereof, of the above mentioned classes, *employing any person in Colorado*") (emphasis supplied).  Therefore, the Court finds that the chosen state of Colorado has no substantial relationship to the parties or the transaction, and accordingly, New Jersey law will apply to Moran's contract claims.

### b.    Alleged Breaches of Employment Agreement

Having determined that New Jersey law governs interpretation of the Employment Agreement, this Court must now consider whether DaVita breached its obligations to Moran under the agreement such that Moran is entitled to recover non-contract damages, such as attorneys' fees, civil penalties, interest, and damages related to Moran's stock options.

To prove a breach of contract, a plaintiff must demonstrate: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007) (applying New Jersey law).  Both parties agree that the first element, the existence of a contract, is satisfied by the Employment Agreement.  With regards to the second

element, Moran claims that DaVita breached its obligations by: (1) prematurely terminating Moran's employment in advance of the November 2, 2006 expiration of the notice period; (2) discontinuing payment of Moran's wages on June 16, 2006, the date Moran last worked at the DaVita offices; and (3) discontinuing payment of Moran's benefits on June 16, 2006.  Though Defendants rest primarily on the absence of damages due to the undisputed fact of DaVita's payments to Moran, totaling $276,397.99, DaVita also counters that it was entitled to immediately remove Moran from her employment duties at any time under the Employment Agreement and that Moran was not entitled to receive wages during the notice period after she had stopped performing services for DaVita.  With regards to benefits, DaVita argues that "if Moran is entitled to damages for 'loss of benefits,' these damages are capped at Moran's out of pocket loss, which is measured by the amount she paid as her COBRA co-payment, or $82.23, for a period of three months (July 2006 through September 2006)."  (Defs.' Reply at 10 n.3.)

The Court begins by examining the terms of the Employment Agreement to assess whether DaVita breached the contract by terminating Moran's employment in advance of the November 2, 2006 expiration of the notice period.   Though the Agreement provides that "employment expires following six months period of notice," it also states that DaVita "is at all times entitled to immediately remove Judith E. Moran from his [*sic*] employment duties, but with unaltered benefits for Judith E. Moran during the period of notice."  (Quigley Certif., Ex. 2.) Neither Defendants nor Plaintiff offered interpretations of these provisions in their briefings to the Court.

Under New Jersey law, matters of contractual interpretation are generally a question of law.  *Dome Petroleum, Ltd. v. Employers Mut. Liab. Ins. Co.*, 767 F.2d 43, 47 (3d Cir. 1985).

When interpreting the terms of the Employment Agreement, a Court must give the contract terms their "plain and ordinary meaning." *See Schor v. FMS Financial Corp.*, 357 N.J. Super. 185, 191 (App. Div. 2002) (citing *Kaufman v. Provident Life & Cas. Ins. Co.*, 828 F. Supp. 275, 283 (D.N.J. 1992)). If the terms of the agreement are clear, the Court must enforce the contract as written. *See, e.g., Graziano v. Grant*, 326 N.J. Super. 328, 342 (App. Div. 1999). Because the Employment Agreement clearly bestows DaVita with the authority to immediately remove Moran from her employment duties during the period of notice, the Court is persuaded that DaVita did not breach the Employment Agreement by removing Moran from her position as a Regional Vice President on June 16, 2006, in advance of the expiration of the agreement's notice period.

Next, the Court must consider whether DaVita breached the Employment Agreement by delaying payment of Moran's notice pay until December 2006. To do so, the Court must determine the timing obligations of DaVita's payments of notice pay to Moran. Under the Employment Agreement, "the severance remuneration is paid after the period of notice has expired." (Quigley Certif., Ex. 2.) There is no reference in the Employment Agreement to the timing of disbursements of notice pay and DaVita has argued that all post-termination pay, whether classified as notice or severance pay, constitutes severance benefits, and were thus subject to § 409A's twenty percent excise tax. Accordingly, notice pay for the period after Moran ceased providing services to the company was not paid until DaVita commenced its severance obligations in December 2006. Because the contract is silent as to DaVita's timing obligations for Moran's notice pay, this Court declines to infer a specific, as opposed to a "reasonable", timing obligation where one does not exist. *See, e.g., Black Horse Lane Assoc.*,

*L.P. v. Dow Chemical Corp.*, 228 F.3d 275, 284 (3d Cir. 2000) (noting "the well-established principle of New Jersey law . . . that where no time is fixed for the performance of a contract, by implication a reasonable time was intended" (internal citations omitted)).  The Court is satisfied that by paying the notice pay in December 2006, DaVita performed its obligations under the Employment Agreement within a reasonable time and there is no breach of the contract on this basis.

Finally, the Court must consider Moran's entitlement to damages for loss of benefits following her termination on June 16, 2006.  The language in the Employment Agreement unambiguously states that though DaVita remained entitled to remove Moran from her employment duties at any time during the period of notice, Moran's benefits were to continue unaltered.  The "Benefits" section of the Employment Agreement states, "[d]uring the term of Judith E. Moran's employment, Judith E. Moran shall be eligible to participate in each pension, welfare and fringe benefit program made available generally to executives of" DaVita.  (Quigley Certif., Ex. 2.)  Presumably, DaVita relies on the clause "[d]uring the term of [Moran's] employment" to relieve it of its duty to pay for Moran's benefits during the period of notice after June 16, 2006 when Moran was not actually a DaVita employee.  However, acceptance of DaVita's argument that it could not allow Moran to remain a participant in the DaVita health and 401k plans after her employment had been terminated (by DaVita) would require the Court to nullify a negotiated contract provision.  To adopt such an interpretation would render superfluous the Employment Agreement's provision that DaVita could immediately remove Moran from her employment duties in the event of a no-cause termination, so long as she continued to receive benefits during the notice period, because the Agreement already provides that DaVita could

-24-

immediately dismiss Moran "in the event of a Cause, in which case all employment benefits . . . shall cease immediately." (*Id.*)  Therefore, if the Employment Agreement empowered DaVita to cease benefits payments at the time of termination, regardless of whether the termination was for cause or whether there existed a notice period pursuant to a no-cause termination, there would be no purpose served by drawing a distinction between terminations for cause with regards to benefits.  Therefore, the Court finds that DaVita breached the Employment Agreement by failing to provide benefits for Moran during the period of June 16, 2006 through November 2, 2006, but reserves judgment as to the amount of damages.  The parties are directed to provide further briefing on the calculation of damages flowing from Moran's loss of benefit coverage.

### c.        Stock Options

Moran also seeks recovery of damages "for intentionally disqualifying Plaintiff from exercising her stock options," which she would have exercised had DaVita not terminated her on June 16, 2006 prior to the date on which her options were scheduled to vest, October 31, 2006. (Pl.'s Opp'n at 24.)  Moran's stock option agreement with DaVita provided that options terminated three months after her separation from the company, without regard to whether the termination was voluntary or involuntary.  (Quigley Certif., Ex. 23.)  DaVita first argues that it was entitled to remove Moran from her employment at any time during the period of notice pursuant to the Employment Agreement and as discussed above.  Defendants next argue that by relying on her deposition testimony of when she would have exercised her stock option had she been permitted to, Moran has failed to produce evidence setting forth with any certainty the appropriate calculation of damages.

Though Moran testified that she intended to exercise her option to purchase DaVita stock

at a price of $49.18 when it vested on October 31, 2006, she has failed to identify with any specificity the date on which she would have sold the shares and what profit she would have realized by such selling.  Given this Court's determination that no breach of the Employment Agreement occurred due to DaVita's termination of Moran prior to November 2, 2006, Moran's consequent disqualification from exercising her stock options, while unfortunate, is not compensable.  Further, the Court agrees that Moran has failed to establish the appropriate amount of damages attributable to her inability to exercise stock options, and accordingly dismisses Moran's claim for compensation for stock options under the Employment Agreement.

### d.     Attorneys' Fees, Civil Penalties, and Interest

After finding that New Jersey law governs Moran's contract claims, this Court concludes that summary judgment is awarded to Defendants on Moran's claims for a civil penalty and attorneys' fees because New Jersey does not permit such a recovery in these circumstances.  (*See* IV.B.1.a, *supra*.)

Moran also seeks interest on the notice pay she received.  Moran claims that DaVita's purported breach of the Employment Agreement by belatedly paying Moran notice pay she believes was due earlier damaged her further by depriving her of the interest on those payments.  As Defendants point out, Moran raises this claim for the first time in her opposition to Defendants' Motion for Summary Judgment.  Essentially, Moran asks this Court to provide her with damages for the lost opportunity to recover interest on the notice pay allegedly owed to her.

This Court finds that because DaVita was entitled to remove Moran from her employment duties at any time during the period of notice, so long as DaVita continued to pay Moran her unaltered benefits, it was not improper for DaVita to withhold payment of Moran's notice pay.

Moreover, Moran has failed to provide the Court with a sum certain of interest allegedly owed to her, or even provide a specific calculation to be applied to determine a sum certain.  Accordingly, interest on this notice pay shall not be awarded to Moran.

### 2.    Discrimination Claims (Counts One, Five, and Eleven)

Moran alleges that DaVita discriminated against her on the basis of her gender (Count One) and age (Count Eleven), and retaliated against her for complaining, in her April 13, 2006 Memorandum to Rodriguez, that DaVita was a hostile work environment (Count Five), in violation of New Jersey's Law Against Discrimination ("NJLAD").  This retaliation appears to consist of DaVita's termination of her employment before November 2, 2006 and DaVita's insistence that Moran execute the Severance Agreement in order to receive severance payments. The parties cross-moved for summary judgment on Counts One and Five, and Defendants moved for summary judgment on Count Eleven (age discrimination).  The Court considers each claim separately.

### a.    Gender Discrimination Claim (Count One)

Defendants contend that Moran has failed to establish a prima facie case of discrimination and that even if it were possible for her to do so, Moran's gender discrimination claim fails as a matter of law because there is no evidence of pretext.  This Court agrees and awards summary judgment on Count One to Defendants.

 The NJLAD provides redress for individuals who are the victims of various types of discrimination, including gender discrimination, by an employer.  *See* N.J.S.A. §§ 10:5-3, 10:5-4; *Chugh v. Western Inventory Services, Inc.*, 333 F. Supp. 2d 285, 289-90 (D.N.J. 2004).  To determine whether there is actionable discrimination under NJLAD, the New Jersey Supreme

Court has adopted the burden-shifting framework established in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792 (1973). *See Dixon v. Rutgers*, 110 N.J. 432, 442 (1988). A plaintiff pursuing a discrimination suit pursuant to the NJLAD must demonstrate the following to maintain a prima facie case of discrimination: (1) plaintiff belongs to a protected class; (2) plaintiff was qualified for the position at issue; (3) plaintiff was subjected to an adverse employment action by her employer; and (4) employees who were not members of the protected class enjoyed more favorable treatment. *Id.* at 443. Under the *McDonnell Douglas* framework, once a plaintiff establishes a prima facie case, the burden shifts to the defendants "to show a legitimate, non-discriminatory reason" for the adverse employment action. *Id.* at 442. If defendants meet that burden, then the plaintiff must "show that defendant's stated reason was merely a pretext or discriminatory in its application." *Id.* To demonstrate pretext and survive summary judgment, a plaintiff must adduce evidence which, by a preponderance of the evidence,

> (1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or (2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Fuentes v. Perskie*, 32 F.3d 759, 762, 765 (3d Cir. 1994) (further holding that a plaintiff may not simply demonstrate that the employer's decision was wrong or mistaken but must "rather demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence") (internal quotations omitted). The burden of proving intentional discrimination rests always with the plaintiff. *Id.* at 763.

Plaintiff Moran, as a woman, is a member of a protected class.  She had held the position of Regional Vice President at Gambro and DaVita for approximately six years prior to her June 16, 2006 termination, and had not violated the terms of her Employment Agreement, thus suggesting that Moran was qualified for the position and satisfying the second element.  For the third and fourth elements, Moran identifies her termination and the delayed payment of her severance and notice pay as evidence of DaVita's alleged disparate treatment, because "other employees outside the protected class were treated more favorably." (Pl.'s Br. at 43.)  Moran points specifically to DaVita's treatment of Donald Beuerle and Robert Oldfield, both of whom were compensated for their continued employment throughout the notice period and received their severance remuneration within weeks after their terminations.  Moran asserts that because she was similarly situated to both Beuerle and Oldfield, DaVita had no grounds to withhold her pay or severance pursuant to § 409A when it determined that § 409A did not require deferral or withholding of Beuerle and Oldfield's severance.

The Court will assume, but not decide, that Moran established a prima facie case of discrimination, and evaluate whether DaVita has articulated a legitimate, non-discriminatory reason for terminating Moran's employment on June 16, 2006 during the notice period.  DaVita contends that Moran's poor performance, and not any gender-related discriminatory animus, prompted the company to terminate her employment.  In support of this argument, DaVita cites Moran's difficulty with the budget process, specifically that Moran took longer to prepare a budget than any other DaVita manager, her failure to address problems at certain clinics in her region, and the ineffectiveness of certain personnel hired by Moran within her group.  Rodriguez addressed each of these concerns in the March 2006 meeting when he informed Moran that she

would not be continuing her relationship with DaVita.

"[I]t should require no citation to state that an employee's poor performance in discharging his duties is a legitimate nondiscriminatory reason to fire or demote the employee." *Casseus v. Elizabeth Gen. Med. Ctr.*, 287 N.J. Super. 396, 405 (App. Div. 1996). Moran has failed to produce admissible evidence that there exists any reason to disbelieve that issues with Moran's performance were the cause of her termination. Moran attempts to salvage her failed claim by making reference to various impolite and decidedly politically incorrect remarks made by Rodriguez in her presence, but fails to provide any evidentiary support for her contentions.[8] Further, the legitimate nondiscriminatory reason of Moran's inadequate job performance cannot be discredited by her own evaluation of her job performance. *See, e.g., Dungee v. Northeast Foods, Inc.*, 940 F. Supp. 682, 689 (D.N.J. 1996) ("It is the perception of the decisionmaker that is relevant, not the plaintiff's perception of herself. . . The plaintiff's subjective belief that she was more qualified for the job does not create an issue of fact for the jury." (internal citations omitted)). Moran has thus failed to carry her burden of creating an issue of fact regarding pretext, and the Court is satisfied that the numerous issues with Moran's performance, all of which were communicated to her at the March meeting, caused DaVita to terminate Moran on June 16, 2006 for performance-based reasons.

Moran also predicates her gender discrimination claim on DaVita's delay in disbursing the severance and notice payments. The Court is dubious that Moran has demonstrated a prima facie case based on the delay because an employee cannot suffer an adverse employment action

---

[8]     As neither party submitted the excerpt of Moran's deposition in which she purportedly ascribed these off-color and arguably sexist comments, the Court is unable to discuss the comments with any detail. Apparently, Rodriguez denies making these comments.

once employment is terminated. *See Glanzman v. Metropolitan Management Corp.*, 391 F.3d 506, 516 (3d Cir. 2004).  However, even assuming Moran made a satisfactory prima facie case, she has failed to raise a triable issue of material fact regarding pretext.

DaVita proffers, as its legitimate nondiscriminatory justification for its conduct, that DaVita chose to delay these payments due to its concern about tax liability under § 409A and Moran's failure to release DaVita from any further financial obligations in connection with § 409A.  DaVita therefore argues that Moran has failed to demonstrate, by a preponderance of the evidence, that this reason was merely pretext or applied in a discriminatory fashion.  The Court agrees.  Though Beuerle and Oldfield continued to receive payments during their respective notice periods, both men had executed agreements that released DaVita from having to reimburse any penalty imposed due to § 409A.  Because Moran declined to execute the same release agreement when offered to her, and also stopped performing services for DaVita on June 16, 2006 unlike Beuerle and Oldfield who continued to render services and thus continued to receive compensation during the notice period, Moran was not positioned similarly to Beuerle and Oldfield.  Therefore, although DaVita's conduct towards these three former Gambro employees with regard to § 409A was materially the same, the employees' reactions to DaVita's approach differed and no discriminatory animus can be inferred.  It was because Beuerle and Oldfield released DaVita from § 409A liability that they received their severance remuneration, and it was because they continued to perform services for DaVita during the notice period that their notice payments were not lumped together with their severance entitlements but were instead paid in a manner consistent with continued employment.  Summary judgment is accordingly denied as to Plaintiff Moran and granted as to Defendants.

### b.       Retaliation Claim (Count Five)

Moran claims DaVita discontinued payment of Moran's notice pay and delayed

commencement of its severance obligations to retaliate for Moran's complaints regarding "the

disparaging and insulting remarks made about Moran's female team members which she felt

evidenced a double standard against the female employees," (Pl.'s Opp'n at 33), and because

she refused to execute the Severance Agreement as a precondition to receiving severance and

notice pay.  This retaliation, Moran argues, violates the NJLAD.

To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged

in a statutorily protected activity; (2) the employer took adverse action against her; and (3) that

there is a causal connection between the two events.  *See Abramson v. William Paterson College*

*of New Jersey,* 260 F.3d 265, 286 (3d Cir. 2001) (setting forth elements of retaliation claim

under Title VII and NJLAD.  The Third Circuit has recognized that complaints that are too

vague or that make a general complaint about unfair treatment without alleging the employer

engaged in unlawful discriminatory conduct do not qualify as protected activity.  *See Barber v.*

*CSX Distrib. Servs.*, 68 F.3d 694 (3d Cir. 1995) (affirming district court's award of judgment as

a matter of law to employer on employee's retaliation claim because plaintiff's letter

complaining of generally unfair treatment did not specifically complain of discrimination).  To

satisfy the second element, a plaintiff must show that the allegedly adverse action is one that

"alters the employee's compensation, terms, conditions, or privileges of employment."

*Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997).  As to the third element,

"temporal proximity between the protected activity and the termination can be itself sufficient to

establish a causal link."  *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 760

(3d Cir. 2004) (internal quotation and editing marks omitted).

This Court finds Moran has failed to establish a prima facie retaliation claim based on her April 13 memorandum to Rodriguez. In that memorandum, though Moran complains of a hostile work environment and claims that she "witnessed feedback and comments from upper management about [Moran] and members of [her] team that can only be considered threatening, demoralizing, and generally offensive," (Pl.'s Br., Ex. C), she nowhere complains that the basis for these "offensive" communications is in any way tied to Moran's gender or the gender of her team members. In addition, Moran's complaints regarding David Smith reflect a particular issue with a specific employee and could not be reasonably interpreted as asserting that Moran was being subjected to discriminatory treatment. Therefore, insofar as Moran's retaliation claim is predicated on her communications with Rodriguez either in the March meeting or in her April 13 follow-up memorandum, Moran has failed to establish the first element of a prima face retaliation claim, and summary judgment is awarded to Defendants.

Moran also cites as "protected activity" her objection to the issuance of the Severance and Release Agreement, which she received on June 16, 2006, the date of her termination. A plaintiff cannot establish a retaliation claim based on purportedly protected activity that occurs after an alleged adverse action. *See Jones v. School Dist. of Phila.*, 198 F.3d 403, 415 (3d Cir. 1999). Accordingly, even if her objections constitute protected activity, the objections must have occurred prior to her June 16, 2006 termination. However, Moran has failed to establish the third element of her prima facie case which requires the protected activity to have caused the adverse employment action. Though Moran has argued that she "opposed" the Severance Agreement, this opposition could have been communicated in June 2006 at the earliest.

Rodriguez's April 13 Notice of Termination memorandum instructs Moran that her payments would be delayed six months. Therefore, Moran cannot prove that DaVita's decision to delay these payments was related to, much less caused by, her own critiques of the Severance Agreement. Summary judgment is therefore awarded to Defendants on this count.

Finally, the Court reiterates its earlier finding that Moran has failed to set forth sufficient evidence of pretext with regard to DaVita's delay in payments pursuant to § 409A, and notes that even if Moran had satisfied her prima facie burden, her retaliation claims would still fail on this basis.

### c.    Age Discrimination Claims (Count Eleven)

Count Eleven of Plaintiff's Complaint alleges DaVita violated the NJLAD and the Age Discrimination in Employment Act ("ADEA") by terminating Moran's employment. The ADEA claim must be dismissed for Moran's failure to exhaust her administrative remedies, as required under the ADEA. *See* 29 U.S.C. § 626(d) (stating, "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission"). Further, Moran's NJLAD age discrimination claims fail as a matter of law because the individual who replaced Moran in the Regional Vice President position, Dennis Skrajewski, is roughly ten years older than Moran. *See Pepe v. Rival Co.*, 85 F. Supp. 2d 349 (D.N.J. 1999) (identifying the fourth element of a plaintiff's prima facie case for an age discrimination claim under NJLAD as the replacement of plaintiff by a significantly younger candidate to permit an inference of age discrimination). Having submitted no opposition to the dismissal of this count, and for the reasons mentioned, the Court awards summary judgment to DaVita on Count Eleven of Moran's

Complaint.

### 3.    Violation of New Jersey Wage Payment Law (Count Three)

Moran charges the Defendants with violating the New Jersey Wage Payment Law, 34

N.J.S.A. §§ 11-1, *et seq.*, ("Wage Payment Law") by "discontinuing plaintiff's [notice] pay for

the purpose of compelling plaintiff to execute an illegal General Release."  (Compl., Count

Three ¶ 10.)  Defendants contend that Moran's Wage Payment Law claim fails as a matter of

law because the notice pay for the period of June 16, 2006 through November 2, 2006 which

was allegedly withheld from Moran does not constitute "wage pay" under the law because

Moran was no longer providing services for DaVita.  Moran failed to oppose summary

judgment on this claim.

The Wage Payment Law defines "wages" as "the direct monetary compensation for labor

or services rendered by an employee, where the amount is determined on a time, task, piece, or

commission basis excluding any form of supplementary incentives and bonuses which are

calculated independently of regular wages and paid in addition thereto."  *See* 34 N.J.S.A. § 11-

401©.  Courts have therefore held that "'wages' are payments promised in advance of the

services performed and paid promptly . . . after services are rendered." *Finkler v. Elsinore*

*Shore Assocs.*, 725 F. Supp. 828, 832 (D.N.J. 1989).  Therefore, this Court concludes that

"wages" as defined in the Wage Payment Law were not intended to embrace payments owed to

an employee pursuant to a contractual obligation but not tethered to the performance of services

by the employee.  *See Bintliff-Ritchie v. Am. Reinsurance Co.*, 285 Fed. Appx. 920, 943-44 (3d

Cir. 2008) (affirming award of summary judgment dismissing plaintiff-employee's Wage

Payment Law claim for money allegedly owed under the employer's incentive compensation

plan, where the employer terminated plaintiff prior to the vesting of the award even though plaintiff had completed the performance period required for the award). The Court holds that Moran cannot recover under the Wage Payment Law for the period of notice between June 16 and November 2, 2006 because she was no longer rendering services for DaVita. Summary judgment is thus awarded to Defendants on this claim.

### 4.    Fraud Claim (Count Four)

Moran contends in her Complaint that "DaVita and its legal counsel falsely stated in writing that [§] 409A of the Internal Revenue Code prohibited DaVita from paying plaintiff her severance pay for six months. . . . Despite . . . DaVita's independent understanding that [§] 409A did not apply to plaintiff's situation, defendant continued to state in writing that it would not commence severance payments, and that the six month waiting period did apply to plaintiff's situation." (Compl. ¶¶ 6-11.) Moran argues that DaVita's discontinuance of payment of her notice pay and refusal to commence severance payments was based on this "knowingly false interpretation of section 409A," and that DaVita is therefore liable for misrepresentation and fraud. (Compl. ¶ 11.) DaVita counters that Moran has failed to adduce sufficient evidence to satisfy the heightened proof of scienter required for liability to attach. Specifically, DaVita argues that Moran has failed to produce any evidence that Mr. Cooper, DaVita's legal counsel, knew that his interpretation of § 409A and its purported application to Moran was erroneous. Moran did not offer any contrary arguments in her briefing of the issue.

In New Jersey, the tort of fraud requires a plaintiff to establish: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by

the other person; and (5) resulting damages." *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 179 F.R.D. 450, 475-76 (D.N.J. 1998) (internal quotations omitted).  Moran has failed to produce any evidence or argument that Cooper knew or had reason to know that DaVita's position regarding § 409A's applicability to Moran was false.[9]  *See, e.g., Isaac v. Jeneby*, 2006 WL 2192848 (N.J. Super. App. Div. July 18, 2006) (granting summary judgment dismissing fraud claim where plaintiffs failed to offer evidence of a "knowing" falsity); *Mango v. Pierce-Coombs*, 370 N.J. Super. 239, 253 (App. Div. 2004) (affirming award of summary judgment on common law fraud claim where "[e]ven if the [allegedly fraudulent] statement proved, in the future, to be false, the motion record contain[ed] no evidence of [the defendant's] knowledge of its falsity.").  Rather, all evidence adduced suggests that Cooper was uncertain as to § 409A's application to DaVita's fifty highest paid employees, including Moran.  Even the evidence cited by Moran regarding Cooper's August 21, 2006 communication to Oldfield wherein Cooper noted that "[DaVita] believe[s] Oldfield *may* fall into one of the exceptions [to §409A]" (Pl.'s Br., Ex. L (emphasis supplied)), confirms that even as late as August 21, 2006, DaVita remained uncertain as to the provision's effect on terminated employees, like Moran and Oldfield.  The complete absence of evidence suggesting that Cooper's advice regarding § 409A was knowingly false requires this Court to award summary judgment on this claim to DaVita.  The claim is accordingly dismissed.

### 5.    Intentional Infliction of Emotional Distress ("IIED") Claim (Count Seven)

Moran alleges that discontinuing her notice pay on June 16, 2006, and requiring Moran

---

[9]    The Court is also unclear as to whether DaVita's interpretation of § 409A as applied to Moran was, in fact, erroneous.

to execute the Severance Agreement constituted intentional and outrageous conduct that proximately caused her to suffer severe emotional distress.  DaVita counters that Moran's IIED claim fails as a matter of law for several reasons.  This Court agrees that even viewing the facts in the light most favorable to Moran, her IIED claim is fatally flawed.

In New Jersey, a plaintiff pursuing an IIED claim must establish "that the defendant acted intentionally or recklessly . . . both to do the act and to produce emotional distress." *Buckley v. Trenton Saving Fund Soc'y*, 111 N.J. 355, 366 (1988).  Further, the defendant's conduct must be sufficiently extreme and outrageous "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d (1965); *see also 49 Prospect St. Tenants Ass'n v. Sheva Gardens, Inc.*, 227 N.J. Supr. 449, 472 (App. Div. 1988) ("The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.").   Third, the defendant's actions must have proximately caused plaintiff's emotional distress.  Finally, plaintiff's emotional distress "must be so severe that no reasonable man could be expected to endure it.  By circumscribing the cause of action with an elevated threshold for liability and damages, courts have authorized legitimate claims whole eliminating those that should not be compensable."  *Buckley*, 111 N.J. at 367 (internal quotations and citations omitted).  As one New Jersey appellate court noted, "[o]ur courts have found this 'elevated threshold' to be satisfied only in extreme cases."  *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23 (App. Div. 2001).  "Generally, it is rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery on a claim of intentional infliction of emotional distress."  *Harris v. Middlesex*

-38-

*County College*, 353 N.J. Super. 31, 46 (App. Div. 2002) (citations and internal quotations omitted).

Moran complains that the following intentional acts by DaVita form the basis of her IIED claim: (1) DaVita's issuance of the Severance Agreement which conditioned Moran's entitlement to notice and severance pay on her execution of the agreement; (2) DaVita's cessation of Moran's notice pay after June 16, 2006 when "it knew" Moran had no other income and was subject to a "broad non-compete clause" in her Employment Agreement; (3) DaVita's unwithdrawn "threat" to Moran that it was reconsidering her entitlement to severance remuneration based on a the expense report for Moran's Atlantic City conference in May 2006; and (4) reversed certain severance payments to Moran in January 2007. (Pl.'s Opp'n at 27.) The Court remains unconvinced that any of these actions, independently or collectively, constitute the type of outrageous conduct intended to be redressed by an IIED claim.

Bearing in mind the repeated admonition of courts in this jurisdiction that instances of viable IIED claims in the employment context should be rare, this Court holds as a matter of law that DaVita's conduct does not rise to the requisite level of outrageousness necessary to provide a basis of recovery. "While loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide a basis for recovery" on an IIED claim. *Griffin*, 337 N.J. Super. at 24. As one court observed, "application of this tort must be restricted to instances of extreme and outrageous conduct; indeed, the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct." *Cautilli v. G.A.F. Corp.*, 531 F. Supp. 71 (E.D. Pa.1982) (applying New Jersey law). This Court does not view DaVita's conduct toward Moran in connection with her departure from the company, i.e. issuance of the

-39-

Severance Agreement, ceasing payment of wages to Moran after she had already stopped

performing services for DaVita, reviewing Moran's expense reports, reversing and then

reinstating Moran's severance and notice pay in January 2007, as sufficiently extreme and

outrageous to take this case outside the bounds of a traditional employment context in which

IIED claims are disfavored.  Summary judgment is therefore granted in favor of Defendant, and

the claim is dismissed.

### 6.   Declaratory Judgment and John Doe Counts (Counts Eight and Nine)

Count Eight of Moran's Complaint seeks a declaration that the non-compete provision in

the Employment Agreement, which expired in 2007, one year from the date of Moran's

termination, is null and void.  Because Moran has been employed as a Regional Vice President

with the dialysis company Fesenius Medical Care since September 2007 and offered no

objection to Defendants' motion to dismiss this count, the claim is mooted and dismissed.

Defendants have also moved for summary judgment on the "John Doe claims" (Count

Nine) in Moran's Complaint.  Plaintiff has provided no opposition to this dismissal of this

claim.  This Court concludes that Count Nine must be dismissed because over two years have

passed since Moran first filed her Complaint, and extensive discovery has been conducted by

the parties.  Moran has at no point sought leave to add additional defendants.  Accordingly, this

claim is dismissed.

### 7.   Negligence (Count Ten)

Finally, the Court considers Moran's allegation that DaVita's negligent supervision of

Rodriguez caused Moran to suffer adverse employment decisions based on her gender and age.

However, as Defendants correctly point out, an action in negligence by an employee against an employer in New Jersey is barred by the New Jersey Workers' Compensation Act ("WCA"), N.J.S.A. 34:15-8.  *See Silvestre v. Bell Atlantic Corp.*, 973 F. Supp. 475, 486 (D.N.J.1997), *aff'd*, 156 F.3d 1225 (3d Cir.1998) (dismissing plaintiff's cause of action for "negligent evaluation," and noting that "plaintiff cannot pursue any cause of action based upon negligence due to the exclusive remedy provision set forth in the New Jersey [WCA]").  Therefore, Moran cannot sustain a claim against DaVita for negligent supervision of its employees, including Rodriguez, and her tenth claim is dismissed.

**V.     Conclusion**

Summary judgment is thus awarded and denied as described above.  An appropriate Order accompanies this Opinion.


Dated: March 23, 2009