# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JUDITH MORAN,** | Civil Action No. 06-5620 (JAP) |
| Plaintiff, | |
| v. | |
| **DAVITA, INC., ET AL.,** | **REPORT AND RECOMMENDATION ON PLAINTIFF'S MOTION TO ENFORCE SETTLEMENT** |
| Defendants. | |

 Presently before the Court is a motion by Plaintiff Judith Moran ("Plaintiff" or "Moran") to enforce the settlement allegedly reached by the parties in October 2012. [Docket Entry No. 93]. Plaintiff seeks an Order requiring Defendants Davita, Inc. ("Davita") and Javier Rodriguez (collectively "Defendants") to pay the agreed-upon settlement amount, as well an additional payment of $3,344 amounting to the tax liability incurred by Plaintiff resulting from Defendants' failure to pay the settlement funds by the end of 2012, and counsel fees expended in the filing of the instant motion. Defendants oppose this motion.

 The Honorable Joel A. Pisano, U.S.D.J., referred the motions to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Based on the reasons set forth below, the undersigned respectfully recommends that Plaintiff's Motion to Enforce Settlement be granted in part and denied in part; specifically, the undersigned recommends that Defendants' Motion to Enforce Settlement be GRANTED, that the request for an additional payment be DENIED and the request for counsel fees be DENIED.

## I. BACKGROUND AND PROCEDURAL HISTORY

 Plaintiff was employed by Davita until November 2, 2006. In October 2006, Plaintiff filed a Complaint in the Superior Court of New Jersey, Somerset County, asserting claims of gender discrimination and breach of contract, as well as related statutory and common law claims. In March 2009, the Honorable Joel A. Pisano, U.S.D.J., granted summary judgment in favor of Defendants on each of Plaintiff's claims with the exception of her breach of contract claim for unemployment benefits. Plaintiff appealed and, in August 2011, the Third Circuit Court of Appeals affirmed in part, and vacated in part. Specifically, the Third Circuit vacated the March 2009 decision regarding Plaintiff's stock option claim and remanded the matter for further proceedings.

 On June 15, 2012, the undersigned held a settlement conference with the parties in an attempt to resolve the outstanding issues. During the negotiations, Plaintiff was represented by

1

Timothy Beck, Esq., and Defendants were represented by Michael T. Pidgeon, Esq., of Pepper Hamilton LLP. According to Mr. Beck, at the June settlement, the "amount of settlement demands and offers were discussed, although no middle ground was reached. However, at no time was anything other than a mutual release of all claims discussed as a means to settle the case." Certification of Timothy P. Beck ("Beck Cert.") ¶ 4.[1] On July 5, 2012, the Court issued a Scheduling Order setting forth various deadlines including that dispositive motions were to be filed by October 12, 2012. [Docket Entry No. 88].

On or about October 11, 2012, Mr. Beck spoke with Mr. Pidgeon about the possibility of negotiating a settlement prior to the filing of dispositive motions. Beck Cert. ¶ 5. According to Mr. Beck, Mr. Pidgeon was "ultimately able to convey an offer of $50,000 that was approved by one level of management, but was subject only to DaVita's labor counsel's approval of the settlement at that amount. Mr. Pidgeon advised that the approval was expected, but needed to be confirmed." *Id.* Plaintiff agreed to settle for $50,000, provided, however "that the settlement amounts were paid prior to December 31, 2012 due to anticipated tax increases that were likely to take effect on January 1, 2013." *Id.* According to the Beck Certification, "Mr. Pidgeon stated that the timing of the payment should not be a problem, but just needed the final approval from Labor Counsel for the amount of the settlement." *Id.*

On October 12, 2012, an email from Mr. Pidgeon confirmed that the parties had agreed to settle the matter for $50,000 and were "awaiting approval from DaVita and Javier." Defs' Br., Ex. A. On that same day, Mr. Beck e-mailed Mr. Pidgeon agreeing to a draft letter to the undersigned requesting an extension and also stating, "[a]ssuming you get corporate approval for the $50,000 settlement, please feel free to prepare a Release for my review." *Id.* In addition, Mr. Pidgeon wrote a letter to the undersigned requesting an extension of the deadline for the filing of dispositive motions because the parties were discussing settlement and "significant movement has occurred as of this morning. The plaintiff has agreed to a number and defense counsel is awaiting final corporate approval of settlement at that amount." Pidgeon Letter (October 12, 2012). Based on this letter, the undersigned granted the extension of time to file dispositive motions.

On October 22, 2012, Mr. Beck wrote to Mr. Pidgeon requesting confirmation of the October 12, 2012 "tentative settlement of the stock option claim....for a payment of $50,000." Beck Letter (October 22, 2012) ("Beck Oct. 22 Letter"). Specifically, Mr. Beck noted, "[y]ou only needed to confirm approval from DaVita's general or labor counsel fo finalize the settlement. . . Please keep in mind that the funds need to be issued prior to the end of the year due

---

[1]While Plaintiff's motion is supported by a Certification from Mr. Beck, the attorney who represented Plaintiff throughout the negotiations, Defendant's opposition does not include a certification from Mr. Pidgeon, counsel that participated in the negotiations on behalf of Defendants. Instead, Defendants' opposition includes only the certification of Jaclyn K. Ruocco, Esq., also from Pepper Hamilton, who entered an appearance for Defendants on December 14, 2012. Accordingly, the facts set forth in the Beck Certification are largely uncontested.

to possible tax consequences if the funds are sent after January 1." *Id*. On October 25, 2012, Mr. Pidgeon confirmed by telephone that the $50,000 settlement had been approved. *Id.* ¶ 8. As a result, no dispositive motions were filed.

At some point thereafter, Mr. Beck inquired from Mr. Pidgeon as to whether in addition to the $50,000 settlement, Defendants would also pay the outstanding judgment entered in that case. Pl's Rep. at 3. On November 9, 2012, Mr. Pidgeon emailed Mr. Beck sating that "DaVita is only willing to pay the 50k total. I will draft a settlement agreement for your review." Pl's Rep., Ex. 1. Because he did not receive any subsequent communications from Defendants, Mr. Beck prepared a Mutual Release and Settlement Agreement that was executed by Plaintiff on November 15, 2012 and sent to Mr. Pidgeon on November 16, 2012. *Id.* ¶ 10.

On November 28, 2012, Mr. Pidgeon emailed Mr. Beck asking if they could discuss the matter. Pl's Rep., Ex. 2. Mr. Beck replied on November 29, 2012 stating that he had sent Mr. Pidgeon a Release/Settlement Agreement and additional documentation. In addition, Mr. Beck provided, "[p]lease do your best to get DaVita to issue the check so we can wrap this up well before end of year." *Id.* In response, on November 29, 2012, Mr. Pidgeon, who was leaving the firm shortly, advised Mr. Beck that "[t]here is some employment-specific language that I think we need to add from our end in the agreement. I can send it to you. I'd like to get this wrapped up before I leave so I completely agree about the urgency and will work to get you the check asap." *Id.* Nonetheless, as of December 14, 2012, Mr. Beck still had not secured the settlement funds or the executed agreement. Beck Cert. ¶ 12.

On December 14, 2012, Mr. Pidgeon's appearance on behalf of Defendants was terminated and Jaclyn Ruocco, Esq., entered an appearance on behalf of Defendants. [Docket Entry No. 91]. On December 17, 2012, "Ms. Ruocco advised [Mr. Beck] that DaVita's Labor Counsel may have some requested revisions or supplemental terms to the Settlement Agreement, one of which was a non-disparagement agreement,"despite the fact that Moran was at that point employed by a competitor of DaVita and had not been employed with DaVita for more than 6 years. Beck Cert. ¶ 13. On December 19, 2012, Mr. Beck wrote to the undersigned advising that the parties were attempting to accommodate DaVita's terms but that some of them were "unacceptable and never previously raised as part of the settlement reached." Beck Letter (Dec. 19, 2012). Mr. Beck requested a telephone conference with the Court.

The undersigned conducted telephone conferences with the parties on December 21 and December 27, 2012. The parties did not execute the Mutual Release and Settlement Agreement and DaVita did not deliver the $50,000 settlement check prior to the end of 2012 or at anytime thereafter.

On February 22, 2013, Plaintiff filed the instant Motion to Enforce Settlement asking the Court to compel Defendants to pay the $50,000 agreed upon by the parties and to execute the Mutual Release and Settlement Agreement executed by Plaintiff on November 15, 2012. In addition, Plaintiff alleges that because the settlement was not finalized prior to the end of 2012 as

agreed upon, the delayed payment will have adverse tax consequences and, as a result, she seeks an additional payment in the amount of $3,344, as well as the counsel fees incurred in the filing of this motion. Defendants filed opposition to this Motion on March 4, 2013. [Docket Entry No. 94]. Defendants contend that the parties never reached an enforceable settlement because any agreement was conditioned upon final approval by DaVita's counsel and the inclusion of a non-disparagement clause. Certification of Jaclyn Ruocco, Esq., ("Ruocco Cert.") ¶ 5. Plaintiff filed a response on March 11, 2013. [Docket Entry No. 95]. Defendants filed a sur-reply on March 18, 2013. [Docket Entry No. 96].

## II.    STANDARD OF REVIEW

A settlement agreement is a type of contract. *See Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 492 (3d Cir.2006) (citing *Borough of Haledon v. Borough of N. Haledon*, 358 N.J.Super. 289, 305 (App. Div.2003)). Consequently, the Court will look to state contract law to determine whether an enforceable settlement agreement has been reached. *See Dep't of Pub. Advocate v. N.J. Bd. of Pub. Util.*, 206 N.J.S uper. 523, 527–28 (App. Div.1985); *Excelsior Ins. Co. v. Pennsbury Pain Ctr.*, 975 F. Supp. 342, 348- 49 (D.N.J.1996) (holding that "state law governs the construction and enforcement of settlement agreements in federal court").

A contract arises from offer and acceptance of terms that are sufficiently definite "that the performance to be rendered by each party can be ascertained with reasonable certainty." *West Caldwell v. Caldwell*, 26 N.J. 9, 24-25 (1958); *Friedman v. Tappan Dev. Corp.*, 22 N.J. 523, 531 (1956). "Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, the parties have created an enforceable contract." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427 (N.J.1992). In that regard, New Jersey courts have held that an unqualified acceptance is necessary to "conclude the manifestation of intent." *Johnson & Johnson*, 11 N.J. 526, 539 (1953). That said, an offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact. *See* Restatement (Second) of Contracts § 19(1) (1981). While silence does not ordinarily manifest assent, the relationships between the parties or other circumstances may justify the offeror's expecting a reply, such that the offeror may correctly assume that the offeree's silence indicates assent to the proposal. *Johnson & Johnson*, 11 N.J. at 539. Thus, when an offeree accepts the offeror's services without expressing any objection to the essential terms of the offer, the offeree has manifested assent to those terms. *Weichert Co. Realtors,* 128 N.J. at 436.

Despite the formal requirements above, a writing is not necessary to create a contract. *Pascarella v. Bruck*, 190 N.J. Super. 118, 124 (App.Div.1983). Indeed, the form of the contract is not the focus of the Court; parties may bind themselves through an informal memorandum, even if they intend to execute a more formal document memorializing the agreement. *See Berg Agency v. Sleepworld–Willingboro, Inc.*, 136 N.J.Super. 369, 374 (App.Div.1975). Courts will enforce settlement agreements notwithstanding the absence of a writing as long as the parties agreed upon the essential terms of a settlement, even if they left the details to be fleshed out in a

writing thereafter. *Lahue v. Pio Costa*, 263 N.J.Super. 575, 596 (App.Div.1993); *Hagrish v. Olson*, 254 N.J.Super. 133, 138 (App.Div.1992). In that regard, determining whether a term is essential "depends on the agreement and its context and also on the subsequent conduct of the parties...." *JM Agency, Inc. v. NAS Fin. Servs., Inc*., No. L–1541–05, 2007 WL 2215393, at *3 (N.J.Super.Ct.App.Div. Aug. 3, 2007) (citing Restatement (Second) of Contracts § 131, cmt. g (1981)).

There is a strong public policy in New Jersey in favor of enforcing settlements. *See Nolan v. Lee Ho*, 120 N.J. 465, 472 (1990). Courts will "strain to give effect to the terms of a settlement whenever possible." *Dep't of Pub. Advocate v. N.J. Bd. Of Pub. Util.*, 206 N.J.Super. 523, 528 (App.Div.1985). Under New Jersey law,"an agreement to settle a lawsuit is a contract which, like all other contracts, may be freely entered into, and which a court, absent a demonstration of fraud or other compelling circumstance, shall honor and enforce as it does other contracts." *Pascarella v. Bruck*, 190 N.J. Super. 118, 124–25 (App. Div.1983) (internal citation and quotation omitted). An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing. *See id.* at 124.

The party seeking to enforce the settlement bears the burden of proving a valid agreement exists. *Browne v. Poly–Chem Sys., Inc.*, No. L–2864–06, 2011 WL 9106, at *3 (App. Div. July 1, 2010) (citing *Amatuzzo v. Kozmiuk*, 305 N.J. Super. 469, 475 (App. Div.1997)). Once that burden has been met, the party seeking to set aside the settlement has the burden of proving "extraordinary circumstances to vitiate the agreement" by "clear and convincing evidence." *Casagrande v. Casagrande*, No. C–268–08, 2012 WL 5990122, at *5 (N.J. Super. Ct. App. Div. Dec.3, 2012).


## III.    DISCUSSION

### A.    The Settlement Agreement

Based on the principles set forth above, the Court must as a preliminary matter determine "when a settlement agreement rises beyond mere negotiations to the level of becoming binding and enforceable on the parties." *Excelsior Ins. Co. v. American Reliance Insurance Co.*, 975 F. Supp. 342, 349 (D.N.J. 1996). Plaintiff contends that the parties had a "clear agreement to settle the case for $50,000 to be paid prior to December 31, 2012." Pl's Br. at 6. Specifically, Plaintiff argues that the parties understood that "the $50,000 settlement reached on October 12 was subject only to corporate approval of a settlement *at that amount*, which was obtained on or before October 25, 2012." *Id.* (emphasis in original). In addition, Plaintiff notes that neither Plaintiff nor Defendants filed dispositive motions prior to, or at any time after, the October 26, 2012 deadline established by the Court; thus, Plaintiff argues, it is axiomatic that the parties understood that they had reached a settlement. *Id.*

In response, Defendants argue that the settlement negotiations never rose to the level of an agreement. Instead, Defendants contend that while the parties reached a preliminary agreement to settle the case for $50,000, the parties also understood that the settlement was contingent on: (1) approval by DaVita; and (2) other formalized settlement terms including a non-disparagement clause. Def's Br. at 4. Further, Defendants provide that Plaintiff has not provided "any writing from DaVita indicating agreement with the purported 'settlement.'" *Id*. at 1, 4.

Initially, the Court must consider whether the discussions of counsel were sufficient to form an agreement. To do so, the Court must carefully consider the record that has been presented, in terms of whether there actually was a point at which there was offer, acceptance and a meeting of the minds as to the material terms of a settlement between the parties here. *See supra* 4-5.

It is undisputed that the parties were engaged in settlement negotiations on October 11 and 12, 2012. The correspondence between the parties indicates that as of October 12, 2012, the parties had negotiated a $50,000 settlement conditioned upon the approval of DaVita's counsel. Defs' Br., Ex. A. Indeed, not only do the emails between the parties indicate the parties' manifest intent to settle, but Mr. Pidgeon wrote to the Court on October 12, 2012 to request an extension of the deadline for filing dispositive motions because "[t]he plaintiff has agreed to a number and defense counsel is awaiting final corporate approval at that amount." Pidgeon Letter (Oct. 12, 2012).

On October 22, 2012, the record indicates that Mr. Beck requested a confirmation from Mr. Pidgeon concerning the tentative settlement conditioned on approval from DaVita's counsel and advising that the "funds need to be issued prior to the end of the year due to possible tax consequences." Beck October 22 Letter. Plaintiff's counsel contends that he reached out to Mr. Pidgeon on October 22 to ensure that the settlement was confirmed prior to October 26, 2012, the deadline to file dispositive motions. *Id.*

In response, Mr. Beck attests that on October 25, 2012, Mr. Pidgeon confirmed by telephone that the settlement had been approved. Beck Cert. ¶ 8. Defendants do not contest these facts as asserted by Plaintiff.

In light of these undisputed facts, the undersigned recommends that Mr. Beck's October 22, 2012 communication to Mr. Pidgeon comprised a counter-offer to settle which included a term regarding the timing of the payment, *see Excelsior*, 975 F. Supp. at 350 & n.9 (defining "counter-offer as an offer made by an offeree which is capable of being accepted by the original offeror. . . [a] common type of counter-offer is the qualified or conditional acceptance, which purports to accept the original offer but makes acceptance expressly conditional on assent to additional or different terms")(quotation omitted), and that Mr. Pidgeon's October 25, 2012 communication was an acceptance of Plaintiff's counter-offer.

To the extent Defendants argue that there was no settlement because there was no writing, *see* Ruocco Cert. ¶ 6, Defendants' argument is unsupported by law. New Jersey courts routinely enforce settlement agreements in the absence of a writing. *See e.g., Berg Agency*, 136 N.J.Super. 369, 374 (App.Div.1975); *U.S. v. Lightman*, 988 F.Supp. 448, 459 (D.N.J. 1997)("the fact the written document was never executed is irrelevant to the enforceability of the agreement."). Defendants appear to confuse the lack of agreement on a document reducing the settlement to a writing with the lack of an agreement itself. Moreover, Defendants have proferred nothing to dispute Plaintiff's factual assertion with regard to Mr. Pidgeon's acceptance of the counter-offer on behalf of Davita, nor do they argue that Mr. Pidgeon did not have authority to act on Defendants' behalf or that he was mistaken when he advised Plaintiff that Defendants had approved the settlement. That the terms were not reduced to a writing does not negate the existence of an agreement. For these reasons, the Court respectfully recommends that as of October 25, 2012, there was an explicit counter-offer to settle by Plaintiff, which was accepted by Defendants.

B.      Essential Terms

Next, the Court must determine whether the settlement agreement contained all of the essential terms needed to enforce the agreement. *See, e.g., Lightman*, 988 F.Supp. at 457. Plaintiff contends that the parties agreed to settle the matter for $50,000 to be paid prior to the end of the year. In response, Defendants argue that: (1) the parties did not agree to the "material term of payment timing nor does the record reflect anywhere an agreement from DaVita as to this timing," Ruocco Cert. ¶ 7; and (2) Defendants would not agree to settle absent a non-disparagement clause and other formalized settlement terms. Defs' Br. at 3- 4.

Initially, with respect to the term requiring payment prior to the end of 2012, it is clear that Mr. Beck's counter-offer, contained in his October 22, 2012 letter, was conditioned on receipt of the $50,000 before the end of the year due to Plaintiff's concern over adverse tax consequences. Although Defendants argue that the parties did not agree to this term, Defendants have put nothing in the record to support such an argument. In fact, the undersigned notes that the record establishes the opposite. Not only does Mr. Pidgeon's undisputed acceptance of Plaintiff's October 22 counter-offer include the term regarding the timing of the payment, but other documents in the record also reference Defendants' understanding that Plaintiff needed to receive payment before the end of 2012. *See* Pl's Rep. Ex. 2. For these reasons, the undersigned recommends finding that there was a meeting of the minds as to the timing of the payment, and that this term is an essential and enforceable term of the settlement agreement.

Finally, Defendants argue that there was no meeting of the minds because of the failure to include a non-disparagement clause and other unspecified formalized settlement terms, which Defendants contend were material and essential. The undersigned does not agree. Nothing in the record demonstrates that Defendants even raised a non-disparagement clause or any other formalized settlement term prior to Mr. Pidgeon's confirmation of settlement on October 25, 2012, let alone agreed that these terms were essential to the agreement. Based on the record

before me, Defendants first raised the issue of including employment-specific language on or about November 29, 2012. Pl's Rep., Ex. 2. Thereafter, beginning in mid-December, Mr. Beck and Ms. Ruocco negotiated additional terms, but Mr. Beck attests that Plaintiff had never previously been advised of Defendants' request for a non-disparagement clause and that Plaintiff, as an employee of Davita's competitor, could never agree to sign such a clause. Beck Cert. ¶¶ 13,14. Thus, although the record demonstrates that during December the parties were still fleshing out the terms to be included in a formalized writing, none of these terms were essential and their absence should not bar enforcement of the settlement agreement. *See Willingboro Mall, Ltd. v. 240/242 Frankling Ave., LLC*, 421 N.J. Super. 445, 453 (App. Div. 2011)(explaining that the absence of terms that "do not alter the basic agreement will not operate to avoid enforcement of an agreement to settle a litigated matter").

Accordingly, the undersigned respectfully recommends that the Court find that there was an enforceable agreement for the payment of $50,000, with the monies to be paid before year end 2012.

C.    Plaintiff's Damages

1.    Tax Consequences

The Court next considers Plaintiff's claim for an additional payment of $3,344. Plaintiff contends that because she did not receive the $50,000 settlement funds in 2012, she will suffer adverse tax consequences of $3,344. The record currently before the Court is insufficient to evaluate Plaintiff's request for this additional payment.

Plaintiff's motion relies on a letter from Plaintiff's accountant, James A. Casella, C.P.A., which contains bullet points purporting to explain the negative tax consequences of a post-2012 settlement for Plaintiff. Mr. Casella does not appear to be offered as an expert, nor is his letter in an admissible form, i.e., affidavit or certification. Pl's Br., Ex. 5. Moreover, Mr. Casella's letter demonstrates the speculative nature of Plaintiff's damages at this time. Indeed, Mr. Casella himself describes Plaintiff's damages as an "estimate" based on "a certain amount of educated conclusions." *Id.* At this juncture, and absent an expert certification or affidavit, the undersigned concludes that Plaintiff's request for a payment of $3,344 is based on conjectures and guesses, and recommends that it be denied. Plaintiff should be given the opportunity to provide a proper certification or expert report setting forth the basis for, and a calculation of, the actual tax consequences for Plaintiff with certainty and specificity.

2.    Attorney's Fees

Plaintiff also requests the attorney's fees and costs she incurred in the filing of this motion. It is well-established that courts have the "*inherent* authority to impose sanctions upon those who would abuse the judicial process." *Republic of the Philippines v. Westinghouse Elec.*, 43 F.3d 65, 73 (3d Cir.1994) (emphasis in original) (citing *Chambers v. NASCO, Inc.*, 501 U.S.

32, 43-44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). These powers derive from "'the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers*, 501 U.S. at 43 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)). The very potency of these powers, however, necessitates that they "be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. Accordingly, the Third Circuit has provided that the sanctioning court "must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." *Republic of the Philippines*, 43 F.3d at 74. In the instant matter, Plaintiff has not set forth any legal argument or factual basis to support the request for a fee award. Thus, the undersigned recommends that Plaintiff's request be denied at this time.

.

**IV.** **CONCLUSION**

For the reasons set forth above, and for good cause shown,

**IT IS** on this **28**th day of **June, 2013**,

**RECOMMENDED** that Plaintiff's Motion to Enforce Settlement [Docket Entry No. 93] be **GRANTED IN PART and DENIED IN PART**; and it is further

**RECOMMENDED** that the Settlement entered into on October 25, 2012 be **ENFORCED**; and it is further

**RECOMMENDED** that the parties be ordered to revise the Settlement Documents to comply with the settlement terms, as clarified herein, within twenty days of the issuance of a final order and that the settlement monies be paid promptly thereafter; and it is further

**RECOMMENDED** that Plaintiff's request for an additional award arising out of the consequences of Defendants' failure to pay the settlement monies to Plaintiff before year end 2012 be **DENIED;** and it is further

**RECOMMENDED** that Plaintiff's request for attorney's fees be **DENIED**; and it is further

**ORDERED** that pursuant to Local Civil 72.1(c)(2), the parties have fourteen days from the date of this Report and Recommendation to file and serve objections to the proposed findings and recommendations.

**LOIS H. GOODMAN**
**United States Magistrate Judge**